# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| STEVEN E. HAMMER, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )   Case No. 08-CV-339-FJG ) |
| JP'S SOUTHWESTERN FOODS, L.L.C. d/b/a JOSE PEPPER'S BORDER GRILL & CANTINA; and DOES 1 through 10, inclusive, | ) ) ) ) |
| Defendants. | ) |

## JP'S CORRECTED REPLY SUGGESTIONS IN
## SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant, JP'S Southwestern Foods, L.L.C. ("JP's"), by and through its attorneys, hereby submits its Corrected Reply Suggestions in Support of its Motion for Summary Judgment.

## I.    INTRODUCTION

In its Suggestions in Opposition to JP's Motion ("Plaintiff's Response), Plaintiff fails to raise a genuine issue of material fact. As a result, JP's is entitled to summary judgment. Plaintiff concedes the following relevant facts:

1. Plaintiff suffered no harm from JP's actions. (Plaintiff's Response to JP's Statement of Facts PRJPSOF (ECF No. 106) at ¶ 22).

2. Plaintiff knows of no class member who suffered any harm from JP's actions. (PRJPSOF at ¶¶ 23, 68).

3. Not later than December 7, 2007, JP's credit card machines were modified by RDS to truncate all receipts printed at JP's. (Plaintiff's Statement of Additional Uncontroverted Facts "PSOF" (ECF No. 106) at ¶ 60).

## II.   JP'S RESPONSE TO PLAINTIFF'S
## STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS

Plaintiff's Statement of Additional Uncontroverted Facts in his Response is largely irrelevant. Except for 67-70 of Plaintiff's Statement, all of these statements are identical to the fact statements set forth in Plaintiff's motion for partial summary judgment. These statements deal with Plaintiff's claim that JP's willfully violated FACTA, which is irrelevant to JP's motion for summary judgment. Plaintiff apparently did this because he cannot submit any genuine facts to refute JP's motion and apparently hopes to muddy the record in a desperate attempt to create a fact issue on JP's motion where none exists.

1.     Defendant operates a Mexican restaurant called Jose Pepper's Border Grill and Cantina in Kansas City, Missouri. (JP's Southwestern Foods, LLC's Responses to Plaintiff's First Request for Admissions, attached as Ex. 1, j 10; Ed Gieselman Deposition, attached as Ex. 2, at 18:20-19:5).

**ANSWER:**    Admit.

2.     Ed Gieselman is a 50% owner of Defendant. (Ex. 2, at 18:20-20:9).  Mr. Gieselman is also the president and 100% owner of Northstar Restaurants, Inc. (Ex. 2, at 26:16-20; Management Agreement, attached as Ex. 10). Northstar Restaurants, Inc., is the agent of and contracted with Defendant to manage its restaurant business. (Ex. 10).

**ANSWER:**    Admit that Gieselman is an owner of JP's and Northstar.  Deny that Northstar contracted with Defendant to "manage its restaurant business", as Mr. Osborn managed JP's and Northstar merely agreed to provide management services to JP's. (Plaintiff's Ex. 10;[1] JP's Statement of Facts ("JPSOF")[2] at ¶ 2). Plaintiff's statement that Northstar is an agent of JP's is a legal conclusion not supported by Plaintiff's Ex. 10 and is denied. (JPSOF at ¶ 12).

3.     The remaining 50% interest in Defendant is owned by Charles Erwin, who has no involvement in the management of Defendant's business operations. (Ex. 2, at 18:20-20:9).

---

[1] These cites reference the exhibits to Plaintiff's Suggestions in Support of Motion for Partial Summary Judgment. (ECF No. 99).

[2] These cites reference JP's Statement of Facts to Which a Genuine Issue Exists in its Suggestions in Opposition to Plaintiff's Motion for Partial Summary Judgment. (ECF No. 104).

**ANSWER:**     Admit.

    4.     Defendant JP's is located at 511 N.W. Barry Road, Kansas City, Missouri 64155. (Ex. 1, ¶ 10).

**ANSWER:**     Admit.

    5.     Defendant is a "person that accepts credit cards or debit cards for the transaction of business" within the meaning of FACTA, 15 U.S.C. § 1681 *et seq.* (Ex. 1, ¶ 7).

**ANSWER:**     Admit.

    6.     In transacting such business, Defendant uses cash registers and/or other machines or devices that electronically print receipts for credit card and debit card transactions. (Ex. 1, 6).

**ANSWER:**     Admit.

    7.     Each of the five credit card terminals used by Defendant prints the same type and form of receipts. (Mitch Osborn Deposition, attached as Ex. 3, at 117:2-19).

**ANSWER:**     Deny. (JPSOF at ¶ 28).

    8.     From 2003-2007, Defendant used the services of Heartland Payment Systems, Inc. ("HPS") for credit card processing. (JP's Southwestern Foods, LLC's Responses to Plaintiff's Second Request for Admissions, attached as Ex. 4, ¶ 148, 150, 152, 154, 156).

**ANSWER:**     Admit.

    9.     In 2003, Mr. Gieselman executed and entered into the Merchant Services Application and Agreement with HPS on behalf of Defendant. (Ex. 2, at 56:7-14).

**ANSWER:**     Admit.

    10.    Mr. Gieselman understands that the function of HPS is to process the credit cards and transfer the funds into Defendant's bank account. (Ex. 2, at 57:5-16).

**ANSWER:**     Admit.

    11.    At the time Mr. Gieselman read and executed the Merchant Services Application and Agreement with UPS, there were policies, procedures, terms, and conditions that Defendant agreed to follow. (Ex. 2, at 61:15-62:4; Documents produced by JP's Southwestern Foods, LLC, attached as Ex. 5, at JP-00753-754).

**ANSWER:**     Admit.

    12.    The Merchant Services Application and Agreement required the following certifications, which were located directly above Mr. Gieselman's signature:

Each of the undersigned certifies as follows: I am an owner or officer authorized by the MERCHANT named above to execute this Application and Merchant Processing Agreement. [...] I further certify that I have received, read, understand and agree to the Card Acceptance Policies, Procedures and Terms and Conditions accompanying this Application and that, when approved by Acquirer/HPS, this Application and the accompanying Card Acceptance Policies, Procedures and Terms and Conditions shall constitute the agreement between the parties.

(Ex. 5, at JP-00754).

**ANSWER:**     Admit.

13.     Specifically, the Card Acceptance Policies, Procedures, Terms and Conditions set forth several "Rights, Duties, and Responsibilities of Merchants" — one of which related directly to credit card transactions:

In cases where prompted by the terminal to do so, MERCHANT shall key enter the last four digits of the bankcard to verify the contents of the magnetic stripe and shall deliver a completed copy of the Sales Draft to the Cardholder. However, the Cardholder copy shall not contain the expiration date or more than the last five digits of the Cardholder number.

(Ex. 2, at 62:8-63:25; Documents produced by Heartland Payment Systems, attached as Ex. 6, at HPS-00088).

**ANSWER:**     Admit.

14.     From 2003-2007, Defendant received regular invoices and/or merchant statements from HPS with respect to its credit card processing services.  (Ex. 4, ¶ 149, 151, 153, 155, 157; Ex. 2, at 83:25-84:3).

**ANSWER:**     Admit.

15.     Defendant's corporate office is responsible for paying the HPS invoices each month.  (Ex. 2, at 84:18-85:3).

**ANSWER:**     Deny that Northstar was JP's "corporate office".  (JPSOF at ¶ 12).

16.     Defendant's corporate office received a similar bill each month from HPS for each of the restaurants owned by Mr. Gieselman.  (Ex. 2, at 88:2-5).

**ANSWER:**     Deny that Northstar was JP's "corporate office".  (JPSOF at ¶ 12).

17.     Thus, in 2006 and 2007, Mr. Gieselman received approximately eight statements from HPS for each particular month, one for each restaurant that he owned.  (Ex. 2, at 88:2-14).

4

**ANSWER:** Deny. Plaintiff's support evidences that Northstar, not Mr. Gieselman, received the subject statements.

18.    Mr. Gieselman expects someone at Defendant's corporate office to read and review the bills and statements received from vendors. (Ex. 2, at 55:23-56:1; JP's Southwestern Foods, LLC's Responses to Plaintiffs Third Request for Admissions, attached as Ex. 7, ¶ 242).

**ANSWER:** Deny that Northstar was "Defendant's corporate office". (JPSOF at ¶ 12).

19.    An individual at Northstar Restaurants, Inc., is responsible for reading and reviewing the bills and statements that are received from vendors for JP's. (Ex. 7¶ 244). Northstar Restaurants, Inc., is the agent of, and contracted with, Defendant to manage its restaurant business. (Ex. 10).

**ANSWER:** Admit the first sentence. Deny that Northstar contracted with Defendant to "manage its restaurant business", as Northstar merely agreed to provide management services to JP's. (JPSOF at ¶ 12). Plaintiff's statement that Northstar is an agent of JP's is a legal conclusion not supported by Plaintiff's Ex. 10 and is denied. (*Id.*).

20.    Mr. Gieselman expects that before any bills or statements are approved for payment or paid by the corporate office, that those bills are reviewed to confirm the bill is appropriate for payment. (Ex. 2, at 56:2-6).

**ANSWER:** Admit.

21.    In January 2005, Defendant received, during its regular course of business, a paper statement from HPS that notified and warned Defendant about the truncation requirements. (Ex. 6, at HPS-00051-HPS-00053; Ex. 4, ¶ 124).

**ANSWER:** Admit.

22.    In the paper statement received by Defendant from HPS in January 2005, the following message was displayed immediately below the area stating the total fees due by Defendant for HPS's credit processing services:

> VISA AND MASTERCARD HAVE MANDATED THAT IN AN EFFORT TO MAINTAIN CARDHOLDER SECURITY, ALL ELECTRONICALLY PRINTED CUSTOMER RECEIPTS TRUNCATE ALL BUT THE LAST FOUR DIGITS OF THE CARDHOLDER CREDIT CARD NUMBER AND SUPPRESS THE EXPIRATION DATE. HPS MEETS THE REQUIREMENTS FOR ALL TERMINALS SHIPPED SINCE JULY 2002 AND UPDATES MERCHANT'S SOFTWARE WHEN POSSIBLE. IF YOUR CUSTOMER RECEIPTS DO NOT MEET THE MANDATES PUT IN PLACE BY THE ASSOCIATIONS OR IN SOME CASES SPECIFIC STATE LAWS, CONTACT HEARTLAND AT 1866-

5

240-4284 FOR DETAILS ON HOW TO BECOME COMPLIANT WITH THE REGULATIONS. IF YOU USE A PUS SYSTEM PROVIDED AND MAINTAINED BY A THIRD PARTY VENDOR, YOU WILL NEED TO CONTACT THE VENDOR DIRECTLY FOR SOFTWARE UPDATES.

(Ex. 6, at HPS-00053).

**ANSWER:**   Admit.

23.   Defendant received, during its regular course of business, HPS invoices for the following months:

(1)   June 2005, (Ex. 6, at HPS-00045-HPS-00047; Ex. 4, ¶ 122);

(2)   July 2005, (Ex. 6, at HPS-00048-HPS-00050; Ex. 4, ¶ 123);

(3)   November 2005, (Ex. 6, at HPS-00002-HPS-00004; Ex. 4, ¶ 104);

(4)   December 2005, (Ex. 6, at HPS-00005-HPS-00007; Ex. 4, ¶ 105);

**ANSWER:**   Admit.

24.   In the invoices received by Defendant from HPS for the months of June 2005, July 2005, November 2005, and December 2005, there were advisories regarding the truncation requirements similar to the advisory contained in the January 2005 invoice. (Ex. 6, at HPS-00047; Ex. 6, at HPS-00050; Ex. 6, at HPS-00004; Ex. 6, at HPS-00007).

**ANSWER:**   Admit.

25.   Defendant received another paper statement from HPS dated May 31, 2006. (Ex. 5, at JP-00925-JP-00930).

**ANSWER:**   Admit.

26.   The HPS statement dated May 31, 2006, received by Defendant contained a section entitled "Hints & Tips" that stated:

Does your point-of-sale system or terminal make the cut? On June 30, 2006 your point-of-sale (POS) system or terminal will be required by Visa regulations to limit the information appearing on electronically printed credit card cardholder receipts to help reduce identity theft and credit card fraud.

Here's what your POS system or terminal must eliminate on all electronically produced cardholder credit card receipts:

- Card expiration date

- All but the last 4 or 5 numbers of the credit card depending on state laws

6

To make sure that your POS system or terminal is in compliance with this requirement, contact your local Heartland Relationship Manager or call 888-963-3600 today.

(Ex. 5, at JP-00928).

**ANSWER:** Admit.

27. Defendant received, during its regular course of business, another paper statement from BPS dated July 31, 2006. (Ex. 6, at HPS-00068-HPS-00073; Ex. 5, at JP-00939-00944; Ex. 4, ¶ 129).

**ANSWER:** Admit.

28. The HPS statement dated July 31, 2006, received by Defendant contained the following "Important Message" displayed on the first page of the invoice, immediately below the area stating the total fees due by Defendant for HPS's card processing services:

In an effort to maintain cardholder security, Visa and MasterCard have mandated that all electronically printed customer receipts truncate all but the last four or five digits of the cardholder credit card number and suppress the expiration date. HPS meets the requirements for all terminals shipped since July 2002 and updates merchant's terminal software when possible. If your customer receipts do not meet the mandate put in place by the Associations or in some specific cases state laws, contact Heartland at 888-963-3600 for details on how to secure compliance with regulations. If you use a POS system provided and maintained by a third party vendor and want details on how to meet the compliance regulations, contact your vendor directly for software requirements and software updates.

(Ex. 6, at HP 8-00068; Ex. 5, at JP-00939).

**ANSWER:** Admit.

29. Defendant received, during its regular course of business, another paper statement from HPS dated April 30, 2007. (Ex. 6, at HPS-00074-HPS-00078; Ex. 5, at JP-00985-00989; Ex. 4, ¶ 130).

**ANSWER:** Admit.

30. The HPS statement dated April 30, 2007, received by Defendant contained the following message displayed in a "New @ Heartland" section of the Merchant Statement:

Ensure Your System is Compliant with New State Laws. To promote consumer protection and reduce identity theft, many states are legislating and enforcing truncation of the merchant and customer receipts. (MasterCard and Visa only require the truncation of the cardholder copy of the receipt.). State laws prevail and penalties for violating these laws can range from $100 to $1,000 for each

7

receipt issued. To ensure compliance with these new laws and protect your business from costly lawsuits, you should follow these easy steps:

- Make sure no more than the last 5 digits of the consumer's card number are printed on receipts

- Confirm that you are not printing the card's expiration date on receipts

- Contact your state representative or legislative office to determine the laws in your state

- Contact your Heartland Relationship Manager or our Service Center (888-963-3600) to evaluate your point of sale application. If you utilize software, you may need to contact your software vendor and schedule an upgrade. If you have a terminal, you may need to contact Heartland for a download of a new application.

As your partner, we are available to help you understand and comply with these laws, for more information, visit www.HeartlandPaymentSystems.com/News.

(Ex. 6, at HPS-00078; Ex. 5, at JP-00989).

**ANSWER:**    Admit.

31.    Defendant received, during its regular course of business, another paper statement from HIPS dated September 30, 2007. (Ex. 6, at HPS-00060-HPS-00064; Ex. 5, at JP-01010-01014; Ex. 4, ¶ 127).

**ANSWER:**    Admit.

32.    The HPS statement dated September 30, 2007, received by Defendant contained the following "Important Message" displayed on the first page of the invoice, immediately below the area stating the total fees due by Defendant for HPS's credit processing services:

To ensure compliance with Visa and MasterCard rules and regulations, be sure you don't display more than the last four digits of the payment card number — and be sure to suppress or disguise the expiration date on electronically printed customer receipts. If your electronically printed customer receipts do not comply with these regulations, you need an update. If you utilize PUS software, please contact your POS software vendor and schedule an upgrade. If you process using a POS terminal, please contact your Heartland Servicing team at 888-963-3600 for a new application download. In addition, states such as California and Colorado have enacted new "Double Truncation" requirements, whereby you are required to mask both the customer and merchant copies of the electronically printed receipts. Please check with either your Counsel or state legislative office to determine the exact laws in your state and then either call us or your software vendor as dictated by your POS solution if an update is required.

(Ex. 6, at HPS-00060; Ex. 5, at JP-01010).

**ANSWER:**     Admit.

33.     Defendant is unable to confirm or deny that it received additional notifications from HPS relating specifically to the truncation requirements. (Ex. 6, at HPS-00001, HPS00008-9, HPS-00010-11; Ex. 4, ¶ 103, 106, 107).

**ANSWER:**     Admit.

34.     Mitch Osborn has been the General Manager of Defendant JP's since June 2004. (Ex. 3, at 38:18-40:5). As General Manager, Mr. Osborn reported to the District Manager, Matt Hench of Northstar Restaurants, Inc. (Ex. 2, at 27:7-28:1).

**ANSWER:**     Admit.

35.     Mr. Osborn first became aware of a problem with Defendant's credit card receipts after being notified by customers of the problem prior to May 15, 2007. (Ex. 3, at 76:1-14; Matt Hench Deposition, attached as Ex. 8, at 72:12-73:2).

**ANSWER:**     Admit.

36.     At that time, Mr. Osborn was told by customers that Defendant's receipts were displaying the customer's entire credit card number. (Ex. 3, at 76:9-14; 77:5-8; 78:15-19).

**ANSWER:**     Admit.

37.     Mr. Osborn reported this problem to Matt Hench, the District Manager, prior to May 15, 2007. (Ex. 3, at 77:18-20; Ex. 8, at 34:7-35:23; Ex. 7, ¶¶ 192-196, 206, 208; Ex. 8, at 72:12-73:2).

**ANSWER:**     Admit that Mr. Osborn reported this problem to Matt Hench, Northstar's District

Manager, but it is unknown if this happened prior to May 15, 2007. (JPSOF at ¶ 4).

38.     At that time, Mr. Hench was also told that a guest had complained that Defendant was printing entire credit card numbers on receipts. (Ex. 8, at 34:23-35:23; Ex. 7, ¶ 208).

**ANSWER:**     Admit.

39.     At the time he was told about Defendant's problem regarding receipts containing entire credit card numbers, Mr. Hench knew that printing credit card numbers on receipts was wrong, and that it needed to be fixed. (Ex. 8, at 38:7-39:18).

**ANSWER:**     Admit.

40. Mr. Hench informed Mr. Osborn that he would find out what Defendant needed to do to fix the problem of printing credit card numbers on receipts. (Ex. 7, ¶ 210; Ex. 8, at 36:6-13; 40:6-19).

**ANSWER:** Admit.

41. Mr. Hench told Mr. Osborn that he would call Retail Data Systems ("RDS") to find out how to get the problem fixed. (Ex. 8, at 36:6-13; 40:6-19).

**ANSWER:** Admit.

42. RDS was the vendor who sold the computer system to Defendant, and, according to Mr. Hench, would be able to fix the problem. (Ex. 8, at 40:20-41:6).

**ANSWER:** Admit.

43. On or about May 15, 2007, Mr. Hench received a quote from RDS to update Defendant's software. (Ex. 8, at 65:12-24; Ex. 7, ¶ 218).

**ANSWER:** Admit.

44. RDS prepared this quote for Defendant to fix its credit card problem. (Ex. 8, at 66:19-22).

**ANSWER:** Admit.

45. Mr. Hench had no authority to approve the RDS quote on his own; it required approval by Defendant's owner, Mr. Gieselman, or by Anita Hance, Mr. Gieselman's sister and Defendant's director of operations. (Ex. 8, at 66:23-67:15; Ex. 2, at 24:3-18).

**ANSWER:** Admit.

46. The decision to use the Aloha software, the point-of-sale software employed by Defendant, was a corporate decision. (Ex. 2, at 48:22-49:7).

**ANSWER:** Admit.

47. If there was a necessary upgrade to the Aloha software that would be of some significant expense, corporate would be required to approve it. (Ex. 2, at 52:1-4).

**ANSWER:** Admit.

48. Mr. Hench brought the receipt problem to the attention of Mr. Gieselman shortly after being notified himself. (Ex. 8, at 69:18-24).

**ANSWER:** Deny. (JPSOF at ¶ 8).

49. Mr. Gieselman overheard a conversation about customers complaining about their credit card numbers being displayed on receipts prior to May 15, 2007. (Ex. 2, at 118:3-18).

**ANSWER:**     Admit.

50.     The decision to correct Defendant's problem regarding printing receipts with entire credit card numbers was in Mr. Gieselman's hands; Mr. Hench believed he had done everything he could do to solve the problem, and he waited to hear from Mr. Gieselman regarding the credit card problem.  (Ex. 8, at 88:22-89:7).

**ANSWER:**     Deny and the evidence cited by Plaintiff does not support this statement.  (JPSOF at ¶¶ 8-11).

51.     Mr. Hench knew that until the new software was installed, Defendant's credit card problem would not be fixed.  (Ex. 8, at 111:2-18).

**ANSWER:**     Deny.  Mr. Hench knew that until the new software was installed, JP's would not

cure the issue of printing receipts with full credit card numbers.  (Plaintiff's Ex. 8 at 111:2-18).

52.     The decision to wait and install the software was at the direction of Mr. Gieselman or Ms. Hance.  (Ex. 8, at 92:5-92:9; 108:25-110:10).

**ANSWER:**     Deny.  (JPSOF at ¶¶ 8-11).

53.     From May 2007 through August 2007, Defendant continued to print entire credit card numbers on receipts.  (Ex. 7, ¶ 177, 179, 181, 183).

**ANSWER:**     Admit.

54.     On August 29, 2007, it was Defendant's custom and practice (or procedure) to provide consumers a receipt that displayed more than the last five digits of their credit card number or debit card number.  (Ex. 1, ¶ 34).

**ANSWER:**     Deny.  (JPSOF at ¶¶ 15-17).

55.     On August 29, 2007, Plaintiff received from Defendant, at its establishment located at 511 N.W. Barry Road, Kansas City, Missouri 64155, an electronically printed receipt.  (Ex. 1, ¶ 12).

**ANSWER:**     Admit.

56.     This electronically printed receipt received by Plaintiff from Defendant on August 29, 2007, displayed more than the last five digits of Plaintiff's credit card number and the credit card's expiration date.  (Ex. 1, ¶ 13).

**ANSWER:**     Admit.

57.     From August 2007 through December 2007, Defendant continued to print entire credit card numbers on receipts.  (Ex. 7, ¶¶ 165, 183, 185, 187, 189, 191).

**ANSWER:** Admit except deny that Defendant continued to print entire credit card numbers on receipts "through December". (JPSOF at ¶¶ 31-32).

58. Defendant's software was updated to truncate the credit card receipts in December 2007. (Ex. 3, at 194:21-195:8).

**ANSWER:** Deny. JP's received new POS terminals and software in December 2007 that truncated the credit card numbers on all of the receipts. (JPSOF at ¶¶ 31-32).

59. Each POS system terminal handling credit card or debit card transactions from which Defendant issued receipts was upgraded on December 7 and 10, 2007. (Ex. 7, ¶ 163).

**ANSWER:** Deny. JP's received new POS terminals in December 2007. (*Id.*).

60. On December 7 and 10, 2007, Defendant's credit card machines were modified by RDS to truncate the receipts. (Ex. 7, ¶ 164).

**ANSWER:** Deny. JP's received new POS machines from RDS that RDS asserted were needed to support the new software that would truncate the credit card numbers on all of the receipts. (JPSOF at ¶¶ 19-20, 31-32).

61. On December 4, 2006, it was Defendant's custom and practice (or procedure) to provide consumers a receipt that displayed more than the last five digits of their credit card or debit card number. (Ex. 1, ¶ 132).

**ANSWER:** Admit.

62. Defendant printed entire credit card numbers on receipts from December 2006 through December 2007. (Ex. 7, ¶¶ 15 167, 169, 171, 173, 175, 177, 179, 181, 183, 185, 187, 189, 191).

**ANSWER:** Deny that Defendant printed entire credit card numbers on receipts "through December 2007." (JPSOF at ¶¶ 31-32).

63. Between December 4, 2006 and December 7, 2007, there were more than 45,000 credit card transactions at Defendant JP's. (Doc. #66, Def's. Opp. to Class Cert., attached as Ex. 9, at 2.)

**ANSWER:** Plaintiff has failed to support this statement with admissible evidence, and JP's has insufficient knowledge or information to answer this statement.

12

64. Since December 4, 2006, there are more than 100 persons to whom Defendant provided an electronically printed receipt at the point of sale or transaction which receipt displayed more than the last five digits of the person's credit card or debit card number. (Ex. 1, ¶ 19).

**ANSWER:** Plaintiff's citation to the record does not support this statement, and JP's has insufficient knowledge or information to answer this statement.

65. In 2006 and 2007, Defendant did not comply with the requirement that the cardholder copy shall not contain more than the last five digits of the cardholder number. (Ex. 2, at 64:10-18).

**ANSWER:** This statement is vague as the specific time period being referenced. JP's admits that for a period of time prior to the time JP's instituted its new credit card procedure in 2007 that it was not in compliance with the referenced requirement.

66 Ed Gieselman, the owner of JP's, is a shareholder in various companies that own and operate ten restaurants. (Ex. 2, at 23:25-24:2).

**ANSWER:** JP's admits that Ed Gieselman, one of the owners of JP's, currently owns and operates 10 restaurants.

67. Defendant (sic) did not learn of the acronym "FACTA" until after he consulted with counsel. Before learning of FACTA, Mr. Hammer knew there were laws that restricted what merchants could print on credit card receipts. During his research, Mr. Hammer learned that receipts should not divulge your credit card information; after finding several receipts in his records that did not comply with the law, he contacted his attorneys. (Ex. 11, at 39:6-18; 40:17-41:8.

**ANSWER:** Denied. Hammer claims that he did not learn of FACTA until after he spoke with his counsel in this case in 2008. (JPSOF at ¶ 17).[3]

68. To Plaintiff's knowledge, the non-compliant receipt issued to him by Defendant has not been stolen, and that the receipt is still in his (or his counsel's) possession. (Ex. 11, at 62:12-24).

**ANSWER:** Admit.

---

[3] This cite references JP's Statement of Uncontroverted Material Facts in JP's Suggestions in Support of Its Motion for Summary Judgment. (ECF No. 101).

69.     Defendant's owner, Ed Gieselman, has insurance coverage for this dispute, and has turned this claim over to its insurance company. (Ex. 2, at 144:20-145:6; 147:14-23).

**ANSWER:**     Plaintiff fails to support any evidence that there is insurance coverage for this dispute. Admit that Mr. Gieselman testified that the claim was turned over to JP's insurance carrier and to his knowledge there has been no response. (Plaintiff's Ex. 2, at 144:20-145:6; 147:14-23).

70.     Attached are examples of the three different types of receipts referred to by Defendant, printed in three different months. (Ex. 12). One receipt displays the entire credit card number. The other two types of receipts, while truncating a portion of the credit card digits, are still non-compliant with FACTA's truncation requirements (no person "shall print more than the last five digits of the card number … upon any receipt"). The other two types referenced in the preceding sentence display the first four and the last four digits of the credit card number. Thus, even Defendant's other two types of "truncated" receipts are still a clear violation of FACTA.

**ANSWER:**     Denied. The receipts with all but the first four and last four digits are in substantial compliance with FACTA.

### III.     ARGUMENT

#### A.     Misstatements In Plaintiff's Introduction

Plaintiff asserts in its Introduction to its Response that JP's arguments could have been asserted "at the inception of the case". (Response at 1). This is incorrect. For example, with respect to Plaintiff's lack of standing such could not be gleaned from the Complaint and JP's did not learn of the factual basis for this argument until after Plaintiff was deposed. With respect to the arguments relating to receipts provided for business related transactions, transactions after December 5, 2007 and from receipts provided to non-owners, such would not apply to Plaintiff and such would not have been relevant until after the Court certified a class in this case earlier this year.

Plaintiff also asserts that JP's issued non-compliant receipts "for the world to see". (Response at 1). However, Plaintiff has conceded that with respect to his receipt, only he and his

14

attorneys saw the receipt, and there is no evidence that anyone outside of those who presented the subject cards to JP's ever saw the receipts.

**B.** **Without Harm Plaintiff Lacks Standing To Prevail In This Case**

Plaintiff concedes that he has not suffered any harm as a result of JP's actions on which his lawsuit is based. Plaintiff further concedes that he knows of no one who has suffered any such harm. By admitting he was not actually harmed as set forth in JP's motion, Plaintiff cannot recover against JP's as a matter of law. Contrary to Plaintiff's argument, JP's argument goes beyond just the fact that no actual identity theft occurred. Here, there is also no potential for any future harm because the subject receipts have always been in possession of either Plaintiff or his counsel.

Plaintiff's only response to this argument is that FACTA does not require that a plaintiff suffer actual monetary damages in order to sue for a violation and it creates a private right of action for consumers. In support of this position, Plaintiff cites the relevant portion of the statute, stating that "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of – (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000." 15 U.S.C. § 1681n(a). Contrary to Plaintiff's contention, this language does not indicate that actual harm is not a prerequisite to recovery. Instead this language merely states that the amount recoverable is either the amount of actual damages sustained or an arbitrary amount of no less than $100 and no more than $1,000. While Plaintiff may not be able to quantify the amount of his injury, he still must establish that he was harmed by JP's conduct. This he has failed to do. The law is clear that Plaintiff cannot recover anything if he has not been harmed by JP's actions.

Even if Plaintiff were correct and actual harm is not required under FACTA, the Act does not supersede the Constitution. Article III of the Constitution requires an actual injury to recover damages. To establish standing to meet the requirements of Article III, a party must establish: (1) the party must have suffered an injury in fact that is concrete and particularized and actual or imminent; (2) there must be a causal connection between the injury and the conduct complaint of; and (3) it must be likely as opposed to merely speculative that the injury will be redressed by a favorable decision. *Planned Parenthood of Mid-Missouri and Eastern Kansas v. Ehlmann,* 137 F.3d 573, 577 (8th Cir. 1998). "Under the Constitution's 'cases or controversies' clause, a party must allege a cognizable and redressable injury in order to pursue a lawsuit." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992). A plaintiff in federal court must prove an actual injury resulting from the illegal action before a federal court may assume jurisdiction. *Linda R.S. v. Richard,* 410 U.S. 614, 618 (1973). It must be more than merely speculative that a favorable decision would redress the plaintiff's injury. *Burton v. Central Interstate Low-Level Radioactive Waste Compact Commission,* 23 F.3d 208, 210 (8th Cir. 1994). Here, allowing Plaintiff to recover money damages would do nothing to redress his injury because he has no injury to redress.

Plaintiff argues that FACTA provides him with a private right of action for statutory damages even if he suffered no actual injury. However, a federal statute cannot confer standing on plaintiffs who do not meet Article III's requirements. *Rivas v. Rail Delivery Serv.,* 423 F.3d 1079, 1083 (9th Cir. 2005). While a federal statute may make the test for standing more rigorous, it cannot make it more lenient than the Article III requirements. *Preston v. Heckler,* 734 F.2d 1359, 1364 (9th Cir. 1984). A plaintiff who meets a valid standing provision of a statute must also meet the requirements for standing under Article III. *Id.*

16

Plaintiff admits that he has suffered no harm. Without an actual injury, he has no standing to sue in federal court according to Article III of the Constitution. FACTA cannot provide him with standing and override the Constitution. Plaintiff cannot recover damages from JP's since he has conceded that he has not been harmed in any manner. Since Plaintiff lacks the requisite standing, summary judgment should be entered in favor of JP's.

Plaintiff relies upon *Ehrheart, Korman*, *MGM Mirage* and *Midwest Airlines* for his argument that harm is required. First, none of these cases are binding on this Court. Second, all of these cases are distinguishable from this case in that they were all based upon pleadings issues on motions to dismiss complaints. Conversely, here JP's seeks summary judgment based upon the factual record established in this case.

C.      **Plaintiff's Damages Request Violates Due Process**

Next, Plaintiff argues that the FCRA's statutory damages provision is not unconstitutionally excessive on its face and that JP's argument is premature. Plaintiff's argument that FCRA's statutory damages provision is not punitive in nature goes against Plaintiff's characterization of the damages as "statutory punishment" and a "statutory penalty". (JPSOF at ¶ 26). Plaintiff calls his classification "immaterial", but such is not the case as it acts as an admission of the type of damages he is seeking in this case, which flows from his concession that he was not harmed by JP's actions. Plaintiff relies on *Harris* and other decisions outside the Eighth Circuit, but once again, these decisions are not binding on this Court. Moreover, *Harris* and the other cases are distinguishable from the facts here. In *Harris*, the court ruled that the defendant's "as applied" challenge was not ripe, in part because class certification has not yet been determined and the district court's assumption that none of the proposed class members suffered any actual damages was not established. Conversely, here the Court has already certified a class involving at least 45,000 receipts and Plaintiff has conceded that none of the class members suffered any actual harm. Thus,

17

unlike *Harris*, JP's "as applied" excessiveness challenge is ripe. Moreover, the *Harris* court's reasoning is incorrect. The *Harris* court held that the FCRA's statutory damages provisions is not punitive in nature because the FCRA already contains a punitive damages provision. *Harris*, 564 F.3d at 1313. While it is true that the FCRA contains a punitive damages provision, here Plaintiff has already conceded that the statutory damages he is seeking are punitive in nature, as he must because he has acknowledged that neither he nor any class member have been harmed by JP's actions. Plaintiff concedes that he is seeking $45,000,000 plus punitive damages, plus attorneys' fees for something that caused no harm to anyone. Moreover, Plaintiff fails to refute the numerous cases cited by JP's supporting its position on this issue.

Plaintiff's position that JP's arguments are premature also fails. Plaintiff fails to state any valid reasons why it is premature. Unlike in the *Harris* case relied on by Plaintiff, here the Court has certified a class and Plaintiff has conceded that neither he nor any class member was harmed by JP's actions. Also, unlike *Harris*, Plaintiff has also filed a motion for summary judgment on the issue of liability. There is no question that if Plaintiff should prevail, he would be awarded an excessive statutory damage award. Plaintiff has identified 45,000 potential class members. He is seeking $1,000 for each class member. At a minimum under the statute each class member would be awarded $100. That would amount to a total between $4,500,000 and $45,000,000. Even the minimum award is a grossly excessive amount for a case where Plaintiff has conceded that nobody suffered any injury. Any award within that spectrum is also improper because it would put JP's out of business and its employees out of work for something that harmed no one.

Case 4:08-cv-00339-FJG   Document 179   Filed 08/04/10   Page 18 of 24

**D.** **Summary Judgment Is Proper For Business Related Transactions**

JP's has established that a number of customers who eat at JP's use a business credit card.[4] In its Motion for Summary Judgment, JP's presented a number of cases where courts entered summary judgment on FACTA claims where credit cards were used for business purposes. In fact, JP's presented an example of a visit to JP's within the class period by someone from Media Professional.[5]

Plaintiff argues that the plain language of FACTA does not exclude businesses from obtaining relief. However, cases interpreting FACTA are to the contrary.

Plaintiff cites *Follman*, *Grabein* and *Shurland* for the proposition that business transactions are recoverable. However, Plaintiff confuses what is covered by FACTA from who may file a lawsuit to recover damages for a FACTA violation. The cases relied upon by Plaintiff merely stand for the proposition that FACTA's protections apply to both business and consumer credit transactions. However, these cases support JP's position that FACTA restricts the availability of civil damages to consumer cardholders. In fact, the *Shurland* case relied upon by Plaintiff specifically noted "[t]rue, FACTA does restrict the availability of civil damages to *consumer* cardholders". *Shurland*, 259 F.R.D. at 160-61. Plaintiff cites no authority for the proposition that civil damages are available under FACTA for non-consumer transactions or to business cardholders.

"The FCRA does not provide a private right of action to business entities" *Pezl v. Amore Mio*, 259 F.R.D. 344, 349 (N.D. Ill. 2009). In *Pezl*, summary judgment was granted to the

---

[4] Plaintiff denies that a significant part of JP's business is business clientele, but fails to submit any evidence to the contrary. Also, Plaintiff argues that in support of this fact JP's "points to a *single* receipt". (PRJPSOF at ¶ 2). This is not true. JP's submitted the unrefuted testimony of its manager Mitch Osborn on this issue. (JPSOF at ¶ 2).

[5] In response to JP's fact statement on this issue, Plaintiff concedes that the card lists "professionalmedia", but claims that this fact is immaterial. (PRJPSOF at ¶ 10). However, Plaintiff has failed to meet his burden to provide evidence to raise a genuine issue of material fact that this was a consumer related transaction.

defendant because the card at use was issued to a business entity that was not entitled to relief under the FCRA. *Id.* Under FACTA, civil damages are specifically restricted to consumer cardholders. 15 U.S.C. § 1681n. FACTA defines "consumer" as an individual, thus limiting private causes of action to natural persons and not artificial entities. *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.,* 259 F.R.D. 151, 161 (N.D. Ill. 2009). Non-human credit cardholders, such as business entities, do not have a cause of action under FACTA. *Grimes v. Rave Motion Pictures Birmingham, LLC,* 264 F.R.D. 659, 664 (N.D. Ala. 2010). Therefore, JP's is entitled to summary judgment on all business related transactions, including the transaction for Media Professional set forth in JP's motion.

**E.  Summary Judgment Is Proper For Transactions After December 5, 2007**

On December 6, 2007, long before this lawsuit was filed, JP's had its credit card registers and software replaced such that the registers no longer printed more than the last four digits of the customer's credit card number on any receipts. Thus, JP's is entitled to summary judgment for any transaction after December 5, 2007. In his Response, Plaintiff argues that JP's first became aware of the truncation problems prior to May 15, 2007. Plaintiff also states that he received a non-complaint receipt on August 2007. However, neither of these facts refutes JP's argument as they both occurred months before JP's had its software replaced. The facts are uncontroverted that JP's installed new registers and software so that it no longer printed a customer's credit card number on December 6, 2007. Since there is no question of fact that JP's was fully compliant with FACTA as of December 6, 2007, summary judgment is warranted for anyone receiving a receipt from JP's after December 5, 2007.

Plaintiff argues that based on JP's conduct, "it is entirely possible that a consumer would come forward with a receipt issued by Defendant after December 5, 2007, that evidences a violation of FACTA's truncation requirements." (Response at 34). Plaintiff has failed to meet

20

defendant because the card at use was issued to a business entity that was not entitled to relief under the FCRA. *Id.* Under FACTA, civil damages are specifically restricted to consumer cardholders. 15 U.S.C. § 1681n. FACTA defines "consumer" as an individual, thus limiting private causes of action to natural persons and not artificial entities. *Shurland v. Bacci Café & Pizzeria on Ogden, Inc.,* 259 F.R.D. 151, 161 (N.D. Ill. 2009). Non-human credit cardholders, such as business entities, do not have a cause of action under FACTA. *Grimes v. Rave Motion Pictures Birmingham, LLC,* 264 F.R.D. 659, 664 (N.D. Ala. 2010). Therefore, JP's is entitled to summary judgment on all business related transactions, including the transaction for Media Professional set forth in JP's motion.

E.    **Summary Judgment Is Proper For Transactions After December 5, 2007**

On December 6, 2007[6], long before this lawsuit was filed, JP's had its credit card registers and software replaced such that the registers no longer printed more than the last four digits of the customer's credit card number on any receipts. Thus, JP's is entitled to summary judgment for any transaction after December 5, 2007. In his Response, Plaintiff argues that JP's first became aware of the truncation problems prior to May 15, 2007. Plaintiff also states that he received a non-complaint receipt on August 2007. However, neither of these facts refutes JP's argument as they both occurred months before JP's had its software replaced. The facts are uncontroverted that JP's installed new registers and software so that it no longer printed a customer's credit card number on December 6, 2007. Since there is no question of fact that JP's was fully compliant with FACTA as of December 6, 2007, summary judgment is warranted for anyone receiving a receipt from JP's after December 5, 2007.

---

[6] Plaintiff submits that JP's registers were replaced on December 7 and 10, 2010. (PSOF at ¶ 60). Regardless, Plaintiff has failed to provide any evidence that any non-compliant receipts were provided by JP's after December 5, 2007.

Plaintiff argues that based on JP's conduct, "it is entirely possible that a consumer would come forward with a receipt issued by Defendant after December 5, 2007, that evidences a violation of FACTA's truncation requirements." (Response at 34). Plaintiff has failed to meet his burden on summary judgment to come forward with evidence to support that anyone received a non-compliant receipt from JP's after December 5, 2007. Plaintiff's speculative argument as to what is "possible" does not satisfy his obligations under Rule 56. *Goldman v. First Nat'l Bank of Boston*, 985 F.2d 1113, 1116 (1st Cir. 1993).

Plaintiff's argument that the Court's class definition should determine who can participate in any class recover is also improper. JP's has submitted unrefuted evidence that no non-compliant receipts were issued after December 5, 2007. As a result, JP's is entitled to summary judgment for any transactions occurring after December 5, 2007.

F.    **Summary Judgment Is Proper Against**
      **Class Members Who Were Not Cardowners**

FACTA was designed to protect the identities of credit card owners. Thus, its application is limited to receipts provided to those individuals who own the credit card. Plaintiff responds by arguing that "cardholder" is defined as any person to whom a credit card is issued or any person who agreed with the card issuer to pay the obligations of another. The first part of that definition, any person to whom a credit card is issued, identifies the owner of the credit card. The second part of that definition involves individuals who have made an agreement with the bank who issued the credit card. It would not apply to someone who simply uses another person's credit card. Thus, any person who was provided a receipt at JP's who was not the card owner is not protected under FACTA and cannot recover any damages against JP's. Plaintiff presents no authority to the contrary. Therefore, summary judgment is proper against any class member who was provided a receipt by JP's but was not the owner of the credit card.

21

In its motion, JP's presented evidence of those signing credit card receipts that were different than the name on the card. (JPSOF at ¶ 12). While Plaintiff denies that these individuals "were not proper cardholders or a co-owner of the respective card presented", in violation of his obligation under Federal Rule of Civil Procedure 56 and Local Rule 56.1, Plaintiff fails to cite any evidence for this proposition. *Goldman,* 985 F.2d at 1116. As a result, summary judgment in JP's favor is also proper on this issue.

## IV.  CONCLUSION

WHEREFORE, Defendant, JP'S Southwestern Foods, L.L.C., respectfully requests this Honorable Court enter summary judgment in its favor and against Plaintiff.

JP'S SOUTHWESTERN FOODS, L.L.C. d/b/a
JOSE PEPPER'S BORDER GRILL & CANTINA

By: /s/Joe Gagnon
        One of Its Attorneys

Joe Gagnon
Gagnon Law Firm, LLC
P.O. Box 208
504 Center Street, Suite E
Lathrop, MO  64465
(816) 740-4541

James K. Borcia
David O. Yuen
Tressler LLP
233 South Wacker Drive, 22nd Floor
Chicago, IL 60606
(312) 627-4000

22

## CERTIFICATE OF SERVICE

I hereby certify that on August 5, 2010, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system which sent notification of such filing to the following:

Ryan L. McClelland
The Flagship Building
200 Westwoods Drive
Liberty, MO 64068- 1170

Fred Walters
Walters. Bender. Strohbehn & Vaughan. P.C.
2500 City Center Square
1100 Main Street
Kansas City, MO 64196

s/ Joe Gagnon

Joe Gagnon
Gagnon Law Firm. LLC
P.O. Box 208
504 Center Street. Suite E
Lathrop, MO 6446;
(816) 740-4541

James K. Borcia
David O. Yuen
Tressler LLP
233 South Wacker Drive, 22nd Floor
Chicago. IL 60606
(312) 627-4000

23