# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | |
|---|---|
| STEVEN E. HAMMER, individually and on behalf of all others similarly situated, | ) ) |
| | ) |
| Plaintiff, | ) |
| vs. | ) No. 08-0339-CV-W-FJG |
| JP'S SOUTHWESTERN FOODS, L.L.C. d/b/a JOSE PEPPER'S BORDER GRILL & CANTINA; and DOES 1 through 10, inclusive, | ) ) ) |
| | ) |
| Defendants. | ) |

# ORDER

Pending before the Court are (1) Defendant JP's Motion for Summary Judgment (Doc. No. 100); and (2) Plaintiff's Motion for Partial Summary Judgment (Doc. No. 98). Both will be considered below. As an initial matter, the parties' requests for oral argument will be denied.

## I.    Background

In order to assist in the prevention of identity theft as well as credit card and debit card fraud, the Fair and Accurate Credit Transactions Act, 15 U.S.C. § 1681 *et seq.* ("FACTA"), provides numerous protections for consumers. Of significance in this action is section 1681c(g), which provides that:

> [N]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last five digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

FACTA required full compliance with its provisions no later than December 4, 2006. 15 U.S.C. § 1681c(g)(3)(A) and (B).

Defendant operates a restaurant in Kansas City, Missouri. Defendant accepts credit cards for payment at its restaurant. Plaintiff made a purchase at Defendant's place of business, and in return, received an electronically printed receipt that appears to not comply with FACTA.

In his Complaint filed May 6, 2008, Plaintiff alleged that Defendants willfully violated FACTA by failing to properly truncate the credit card and debit card numbers on electronically printed receipts provided to their customers. FACTA provides for damages for willful violation of FACTA of "not less than $100 and not more than $1,000" for each aggrieved person. 15 U.S.C. § 1681n(a)(1)(A). Plaintiff seeks statutory damages on behalf of himself and a class of similarly situated individuals pursuant to section 1681n(a)(1)(A), and punitive damages pursuant to section 1681n(a)(2).

## II.    Facts

Defendant is a corporation that owns and operates a Mexican restaurant called Jose Pepper's Border Grill and Cantina located at 511 N.W. Barry Road, Kansas City, Missouri. Defendant's only business is owning and operating Jose Pepper's. Ed Gieselman is a 50% owner of Defendant. Mr. Gieselman is also the president and 100% owner of Northstar Restaurants, Inc. Currently, Mr. Gieselman owns and operates 10 restaurants. Plaintiff alleges that Northstar Restaurants, Inc. is the agent of JP's; however, defendant denies this assertion, and the record demonstrates that there is a contract between Northstar Restaurants, Inc. and defendant that indicates that Northstar provides managerial and accounting services to JP's, including the collection of sales receipts and payment of all bills. See Ex. A ¶3 to Defendant's Suggestions in Opposition (Doc. No. 178); Management Agreement between Northstar and JP's (Doc. No. 99, Ex. 10). The remaining 50% interest

2

in Defendant is owned by Charles Erwin, who has no involvement in the management of Defendant's business operations.

Defendant is a "person that accepts credit cards or debit cards for the transaction of business" within the meaning of FACTA, 15 U.S.C. § 1681 et seq. In transacting such business, Defendant uses cash registers and/or other machines or devices that electronically print receipts for credit card and debit card transactions. From 2003-2007, Defendant used the services of Heartland Payment Systems, Inc. ("HPS") for credit card processing. In 2003, Mr. Gieselman executed and entered into the Merchant Services Application and Agreement with HPS on behalf of Defendant. Mr. Gieselman understands that the function of HPS is to process the credit cards and transfer the funds into Defendant's bank account. At the time Mr. Gieselman read and executed the Merchant Services Application and Agreement with UPS, there were policies, procedures, terms, and conditions that Defendant agreed to follow. The Merchant Services Application and Agreement required the following certifications, which were located directly above Mr. Gieselman's signature:

> Each of the undersigned certifies as follows: I am an owner or officer authorized by the MERCHANT named above to execute this Application and Merchant Processing Agreement. . . . I further certify that I have received, read, understand and agree to the Card Acceptance Policies, Procedures, and Terms and Conditions accompanying this Application and that, when approved by Acquirer/HPS, this Application and the accompanying Card Acceptance Policies, Procedures and Terms and Conditions shall constitute the agreement between the parties.

Specifically, the Card Acceptance Policies, Procedures, Terms and Conditions set forth several "Rights, Duties, and Responsibilities of Merchants" – one of which related directly to credit card transactions:

In cases where prompted by the terminal to do so, MERCHANT shall key enter the last four digits of the bankcard to verify the contents of the magnetic stripe and shall deliver a completed copy of the Sales Draft to the Cardholder. However, the Cardholder copy shall not contain the expiration date or more than the last five digits of the Cardholder number.

From 2003-2007, Defendant received regular invoices and/or merchant statements from HPS with respect to its credit card processing services. Northstar is responsible for paying the HPS invoices each month. Northstar received a similar bill each month from HPS for each of the restaurants owned by Mr. Gieselman. Therefore, Northstar received approximately eight statements from HPS for each particular month, one for each restaurant owned by Mr. Gieselman. Mr. Gieselman expects someone at Northstar to read and review the bills and statements received from vendors. An individual at Northstar Restaurants, Inc., is responsible for reading and reviewing the bills and statements that are received from vendors for JP's. Mr. Gieselman expects that before any bills or statements are approved for payment or paid by the corporate office, that those bills are reviewed to confirm the bill is appropriate for payment.

In January 2005, Defendant received, during its regular course of business, a paper statement from HPS that notified and warned Defendant about the truncation requirements. Defendant received HPS invoices containing additional advisories regarding the truncation requirements in June 2005, July 2005, November 2005, and December 2005. Additionally, defendant received another paper statement from HPS dated May 31, 2006, which included a section entitled "Hints & Tips" discussing the truncation requirements. A paper statement from HPS dated July 31, 2006, contained an "Important Message" regarding truncation of electronically printed customer receipts. Defendant received other statements from HPS discussing truncation requirements dated April 30, 2007, and September 30, 2007.

4

Mitch Osborn has been employed as the General Manager of defendant since June 2004. As General Manager, Mr. Osborn reported to the District Manager, Matt Hench of Northstar Restaurants, Inc. Mr. Osborn first became aware of a problem with Defendant's credit card receipts after being notified by customers of the problem prior to May 15, 2007. At that time, Mr. Osborn was told by customers that Defendant's receipts were displaying the customer's entire credit card number. Prior to that he was unaware of any requirement that customer credit card numbers be truncated. Mr. Osborn reported this problem to Matt Hench. At that time, Mr. Hench was told that a guest had complained that defendant was printing entire credit card numbers on receipts. Mr. Hench knew at that time that printing credit card numbers on receipts was wrong, and that it needed to be fixed. Mr. Hench informed Mr. Osborn that he would find out what Defendant needed to do to fix the problem of printing credit card numbers on receipts.

Mr. Hench told Mr. Osborn that he would call Retail Data Systems ("RDS") to find out how to get the problem fixed. RDS was the vendor who sold the computer system to Defendant, and, according to Mr. Hench, would be able to fix the problem. On or about May 15, 2007, Mr. Hench received a quote from RDS to update Defendant's software to fix its credit card problem. Mr. Hench had no authority to approve the RDS quote on his own; it required approval by Defendant's owner, Mr. Gieselman, or by Anita Hance, Mr. Gieselman's sister and Defendant's director of operations. The decision to use the Aloha software, the point-of-sale software employed by Defendant, was a corporate decision. If there was a necessary upgrade to the Aloha software that would be of some significant expense, corporate would be required to approve it. Mr. Gieselman overheard a conversation about customers complaining about their credit card numbers being displayed

5

on receipts prior to May 15, 2007. Mr. Hench knew that until the new software was installed, JP's would not cure the issue of printing receipts with full credit card numbers.

At some time after the customers alerted Mr. Osborn to the issue, until a permanent solution could be implemented, he instituted a procedure at the restaurant that only receipts with the first four digits and the last four digits of the credit card number should be given to the customers. Notably, however, on August 29, 2007, plaintiff received from Defendant, at its establishment located at 511 N.W. Barry Road, Kansas City, Missouri, an electronically printed receipt that contained all the digits of plaintiff's credit card number.

From August 2007 through December 5, 2007, defendant continued to print entire credit card numbers on receipts; however, it is unclear how many of these receipts were provided to customers, given defendant's procedure discussed in the preceding paragraph. Defendant's software was either updated in December 2007 (according to plaintiff's statement of facts), or it received new POS terminals and software in December 2007 (according to defendant's statement of facts); in any event, after December 5, 2007, defendant's credit card machines printed truncated receipts.

On December 4, 2006, it was defendant's custom and practice (or procedure) to provide consumers a receipt that displayed more than the last five digits of their credit card or debit card number. For a period of time prior to the time JP's instituted its credit card procedure in 2007 it was not in compliance with the requirement that the cardholder copy not contain more than the last five digits of the cardholder number.

Defendant indicates that a portion of Jose Peppers' business is business clientele, which frequently includes visits by business people having business lunches and dinners. As an example of this, defendant point to a receipt dated December 20, 2006, when a

6

person who presented a credit card with the name "Media Professional" purchased items from Jose Peppers.

Hammer filed this lawsuit on May 6, 2008. Including this case, Hammer filed thirteen FACTA lawsuits in this District. No one other than Plaintiff Steven Hammer has ever asserted a claim against JP's for not truncating the number on a credit card receipt; the only other "claims" against JP's were customer complaints in 2007. To plaintiff's knowledge, the non-compliant receipt issued to him by Defendant has not been stolen, and that the receipt is still in his (or his counsel's) possession. Hammer did not suffer any actual damages as a result of receiving the subject credit card receipt from JP's, and he has never been the victim of any type of identity theft.[1] Hammer knows of no class member that suffered any actual damages or identity theft as a result of receiving a non-compliant receipt from JP's. The class in this matter may consist of more than 45,000 consumers. Thus, defendant argues that plaintiff seeks statutory damages of "not less than $100 and not more than $1000" for each violation and thus seeks statutory damages in the range of between $4.5 million and $45 million, plus punitive damages, attorneys' fees and costs.

JP's total equity value as of March 23, 2010 was in the negative, specifically a negative $214,605.08. JP's net income for the time period 2006 through 2009 was as follows: 2006--($36,091.86), 2007--$2,635.09, 2008--$56,865.10, and 2009--$122,471.87. Although plaintiff alleges that defendant has insurance coverage for this dispute, defendant

---

[1]The Court notes that, after discovery closed in this matter, plaintiff claimed in his response to defendant's motion in limine that he had recently been the victim of identity theft (see Doc. No. 173, filed on August 3, 2010). However, the Court finds that whether plaintiff has recently been the victim of identity theft is immaterial to the considerations presented in the motions for summary judgment.

7

asserts that the claim was turned over to its insurance carrier, and to Mr. Gieselman's knowledge there has been no response.

## III.    Defendant JP's Motion for Summary Judgment (Doc. No. 100)

Defendant moves for summary judgment, indicating (1) plaintiff does not have Article III standing; (2) the damages sought violate due process; (3) statutory damages are not available to business customers; (4) damages are not available for transactions occurring after December 5, 2007; and (5) damages are not available to class members provided a receipt who were not the cardowner. Each of these grounds will be considered below.

### A.    Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual

8

disputes between the parties is insufficient to avoid summary judgment. <u>Id.</u> Rather, "the disputes must be outcome determinative under prevailing law." <u>Id.</u> (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." <u>Matsushita</u>, 475 U.S. at 586. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." <u>Celotex</u>, 477 U.S. at 327.

   B.   Discussion

        1.   Has plaintiff suffered harm sufficient to convey standing?

To demonstrate Article III standing, plaintiff must prove: (1) that he suffered an "injury-in-fact"; (2) that a causal relationship exists between the injury and the challenged conduct, and (3) that the injury will likely be addressed by a favorable decision. <u>Amburgy v. Express Scripts, Inc.</u>, 671 F.Supp.2d 1046, 1050 (E.D. Mo. 2009) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 560-61 (1992); <u>Steger v. Franco, Inc.</u>, 228 F.3d 889, 892 (8th Cir. 2000). Abstract injury is not sufficient; instead, the threat of injury must be concrete and particularized, not conjectural or hypothetical. <u>Id.</u> Actual injury, however, "may exist *solely* by virtue of 'statutes creating legal rights, the invasion of which creates standing. . . .'" <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 373 (1982)(quoting <u>Warth v. Seldin</u>, 422 U.S. 490, 500 (1975) (emphasis added)).

Defendant argues that no actual harm was alleged by plaintiff, and that plaintiff

admitted at his deposition that he has no actual damages.  Defendant argues that because plaintiff gave his receipt to his attorney in 2008, there is no possibility that plaintiff will ever be injured by the conduct alleged in his complaint.  Defendant, therefore, argues that plaintiff has not demonstrated Article III standing sufficient to maintain this action. Defendant cites to Amburgy v. Express Scripts, Inc., 671 F.Supp.2d 1046 (E.D. Mo. 2009) as an example of a case where a court found Article III standing to be absent (finding, instead, that an increased risk of harm from possibly having plaintiff's personal information compromised to be insufficient to state an injury-in-fact).  Notably, however, Amburgy was a case involving a data security breach and alleging a variety of state-law tort and contract claims, not a case alleging a FACTA violation such as the present matter.[2]

In response, plaintiff notes that FACTA does not require that a plaintiff suffer actual monetary damages in order to sue for a violation; instead, it states that "Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of – (1)(A) any actual damages sustained by the consumer as a result of the failure or damages of not less than $100 and not more than $1,000."  15 U.S.C. § 1681n(a).  Other courts have found that actual damages are not a prerequisite to recovering statutory damages.  See Ehrheart v. Lifetime Brands, Inc., 498 F.Supp.2d 753, 755-56 (E.D. Pa. 2007); Korman v. Walking Co., 503 F.Supp.2d 755, 759 (E.D. Pa. 2007); Ramirez v. MGM Mirage, Inc., 524 F.Supp.2d

---

[2]Indeed, the Court in Amburgy noted that there is no private cause of action under Missouri law for a person allegedly aggrieved by the breach of a database containing the person's confidential information.  671 F.Supp.2d at 1055.  Obviously, FACTA provides aggrieved individuals a cause of action when they have been provided receipts containing more than five digits from the individual's credit card number.

1226, 1230-31 (D. Nev. 2007). Plaintiff further notes that statutes may create legal rights, and that FACTA has created a legally protected interest in being handed a receipt that omits certain of plaintiff's credit card information. See Korman, 503 F.Supp.2d at 759; Ehrheart, 498 F.Supp.2d at 755; Ramirez, 524 F.Supp.2d at 1231.

Defendant replies that a federal statute cannot confer standing on plaintiffs who do not meet Article III's requirements. See Rivas v. Rail Delivery Serv., 423 F.3d 1079, 1083 (9th Cir. 2005). Defendant also attempts to distinguish the cases relied upon by plaintiff as (1) not binding on this Court; and (2) rulings at the motion to dismiss stage rather than at the summary judgment stage.

The Court does not find defendant's arguments to be persuasive. Instead, the Court finds, as have the other courts mentioned above, that FACTA has created a legally protected interest in being handed a receipt that omits certain of plaintiff's credit card information. Violation of that legally protected interest is a sufficient injury-in-fact to confer standing. Plaintiff further has sufficiently alleged that a causal relationship exists between that injury and defendant's challenged conduct, and that injury would likely be addressed by a favorable decision. Defendant's motion is **DENIED** in this respect.

2.      Do the damages sought violate due process?

Defendant argues, in the alternative, that FACTA's damages provisions create a remedy that threatens to drive businesses out of existence or into bankruptcy by imposing damages that are disproportionate to the actual damage suffered by any person. Defendant notes that the statute imposes $100 to $1,000 in statutory damages for willful violations, and a plaintiff may also recover punitive damages plus attorneys' fees and costs. See 15 U.S.C. § 1681n. Defendant states that this is a potential business-ending exposure

11

for defendant doing something where it received absolutely no benefit. Defendant indicates that this is grossly excessive punishment in violation of the Fifth and Eighth Amendments of the United States Constitution. See Parker v. Time Warner Entm't Co., 331 F.3d 13, 22 (2d Cir. 2003) (finding that such a minimum per-consumer award of damages in the class-action context may make statutory damages come to resemble punitive damages, and that, in a sufficiently serious case the due process clause might be invoked, not to prevent certification, but to nullify that effect and reduce the aggregate damage award). Defendant argues that, given the number of potential class members, JP's would be subject to a minimum statutory award in excess of $4,500,000 ($100 per 45,000 class members, plus punitive damages, attorneys' fees and costs), and a possible judgment in excess of $45,000,000 ($1,000 per 45,000 class members). Defendant argues that this sum would be enough to put JP's out of business and its employees out of work, for actions that resulted in no damage to anyone.

In response, plaintiff argues that defendant cannot demonstrate a facial challenge to the constitutionality of the statutory damage provision, as defendant cannot establish that "no set of circumstances exists under which the Act would be valid," see United States v. Brown, 441 F.3d 1330, 1367 (11th Cir. 2006)(quoting United States v. Salerno, 481 U.S. 739, 745 (1987)), and Harris v. Mexican Specialty Foods, Inc., 564 F.3d 1301, 1311 (11th Cir. 2009)(finding, in an examination of FACTA's damages provisions, that "the mere possibility of a constitutional application is enough to defeat a facial challenge to the statute"). Additionally, plaintiff argues that defendant's "as-applied" challenge to the statutory damages provision is premature, as the Court would have to engage in speculative factual assumptions at this time (i.e., assuming that the defendant will be found

12

to have violated the statute, that the violation was willful, and that the end result will be the imposition of a constitutionally excessive damages award), instead of relying on a developed factual record.  See Texas v. United States, 523 U.S. 296, 300 (1998)(finding "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all"); Harris, 564 F.3d at 1310 (finding an "as-applied" challenge to FACTA's damages provisions to be unripe when there had been no final ruling or verdict on willfulness and no final determination as to the size of the ultimate verdict); Ramirez, 537 F.Supp.2d at 1169 (such an argument is premature when "there is not yet any damage award for the court to review").

The Court finds plaintiff's position to have merit.  Defendant has not demonstrated that no set of circumstances exists under which FACTA's damages provisions would be valid.  Additionally, the Court finds that defendant's as-applied challenge is premature, and would be better stated after a verdict has been entered in this case.  Defendant's motion will be **DENIED** on this point as well.

### 3.    Are statutory damages available to business customers?

Defendant argues that FACTA limits recovery of statutory damages to consumer cardholders, and does not allow for damages for business card holders or for business related transaction.  15 U.S.C. § 1681n (providing "Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer . . . (emphasis added)); 15 U.S.C. § 1681a(c) (defining a consumer as an "individual"); Pezl v. Amore Mio, 259 F.R.D. 344, 347-48 (N.D. Ill. 2009).  Defendant indicates that it frequently has customers who visit the restaurant for business purposes. Defendant requests summary judgment in its favor as to all business-related transactions.

13

In response, plaintiff notes that FACTA provides: "[N]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681c(g). Cardholder is defined as "any person to whom a credit card is issued or any person who has agreed with the card issuer to pay obligations arising from the issuance of a credit card to another person." 15 U.S.C. § 1602(m). "Person" means "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." 15 U.S.C. § 1681a(b). Plaintiff states that the plain language of the statute indicates that there is no business transaction exception to FACTA.

In reply, defendant indicates that Plaintiff has confused what transactions are covered under FACTA with who may file a lawsuit to recover damages under FACTA. Although FACTA's protections apply to both business and consumer transactions, 15 U.S.C. § 1681n, which supplies the authority to file a lawsuit, applies only to consumers. The Court agrees with defendant's interpretation of the statute. Therefore, only consumers who are members of the class may recover damages. Summary judgment is **GRANTED** as to the claims of any non-consumer cardholder.[3]

4.    Transactions after December 5, 2007

Defendant indicates that summary judgment is proper for all transactions after

---

[3]The Court finds, however, that defendant has not yet demonstrated that the card holder of the "Media Professional" credit card referenced in the statement of facts is not a "consumer" under FACTA's damages provisions.

14

December 5, 2007, as on December 6, 2007, JP's had its credit card registers and software replaced so that the registers no longer printed more than the last four digits of the customer's credit card number.

In response, plaintiff states that, "While Plaintiff can point to no facts or documents *proving* that Defendant issued non-compliant receipts to its consumers *after* December 5, 2007," the Court should not trust defendant's assertion that the system was fixed after that date, and instead, the Court should view defendant's assertion as suspect. See Doc. No. 106, p. 34. Plaintiff also indicates that the class definition, which was "already approved by the Court," should control who can and cannot participate in class recovery. The class definition is "All persons to whom Defendant provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, on which Defendant printed more than the last five digits of the person's credit card or debit card number (the "Class")." See Order, Doc. No. 89. Plaintiff states that the class definition, therefore, would preclude recovery for persons who received a receipt that was compliant with FACTA's provisions.

The Court agrees with defendant that the facts are uncontroverted that JP's fixed its system on December 6, 2007, so that it printed no more than the last four digits of a customer's credit card number on or after that date. The Court agrees the plaintiff has failed to meet its burden on summary judgment by failing to set forth evidence that anyone received a non-compliant receipt after December 5, 2007. Therefore, defendant's motion for summary judgment will be **GRANTED** in this respect.

Further, the Court is certainly able to amend the class definition in this case, especially given that notice has not yet been provided to members of the class.

15

Accordingly, the Court will **AMEND** the class definition to be "All persons to whom Defendant provided an electronically printed receipt at the point of sale or transaction, in transactions occurring between December 4, 2006, and December 5, 2007 . . . ."

        5.     Are damages available to those class members provided a receipt that are not the cardowner?

Defendant argues that the purpose of FACTA is to protect the security of cardowners, not those individuals who were provided receipts who were not cardowners. See 15 U.S.C. § 1681c(g)(1), which provides: "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction."  (Emphasis added.)  Defendant indicates that many of the receipts were signed by individuals who were not the cardowner, and there is no basis to provide relief to those individuals.    Plaintiff responds that FACTA's statutory language does not distinguish between cardowners and cardholders, and one could imagine many circumstances where the cardholder was not the actual owner of the card, but who was an authorized and intended user of the card.  Defendant replies that any person who was provided a receipt a JP's who was not the card owner is not protected under FACTA and cannot recover damages against JP's.

The Court cannot grant defendant's motion, which cites to no authority for the proposition asserted.  The Court, further, is unable to find any authority for this proposition in the research it has conducted.  Therefore, defendant's motion as to class members who

were provided a receipt but are not the owner of the card is **DENIED.**[4]

## IV. Plaintiff's Motion for Partial Summary Judgment (Doc. No. 98)

Plaintiff seeks partial summary judgment as to (1) whether defendant violated the Fair and Accurate Credit Transactions Act ("FACTA"), 15 U.S.C. §1681c(g), by printing more than the last five digits of plaintiff's credit card number on a receipt that was provided to him at the point of sale; and (2) whether defendant <u>willfully</u> violated FACTA with either knowledge or reckless disregard as to whether its conduct violated the law.

### A. Violation of FACTA

Plaintif indicates that it is undisputed that defendant violated FACTA. FACTA provides, in relevant part:

> [N]o person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction.

15 U.S.C. § 1681c(g). FACTA gave merchants up to three years to comply with its requirements, requiring full compliance by December 4, 2006. 15 U.S.C. § 1681c(g)(3).

Plaintiff indicates the evidence is uncontroverted that defendant violated FACTA, as defendant admits it provided plaintiff Steven E. Hammer a non-compliant receipt on August 29, 2007. Plaintiff further indicates that defendant has admitted that it did not begin complying with FACTA until approximately December 2007. Plaintiff states that it is entitled to summary judgment as to whether defendant violated FACTA.

Defendant responds that plaintiff's motion is "hopelessly vague," in that it does not

---

[4]Further, defendant's concern seems to be the type of concern that would be better addressed at the stage when members of the class are filing claims to receive a portion of a settlement or judgment fund.

specify whether plaintiff is seeking summary judgment just for himself, for certain class members, or for the entire class. Defendant indicates this distinction is important, as defendant "implemented a new procedure at some point in 2007 that required its servers to only provide receipts with truncated credit card numbers to its customers." See Doc. No. 178, p. 18.[5] Defendant further suggests that plaintiff has failed to introduce into evidence the receipt for any class member except for himself, thereby failing to establish that any class member received a receipt that violated FACTA after defendant implemented this new policy.

It is clear that the receipt provided to plaintiff violates FACTA, and so summary judgment as to that single violation can be **GRANTED**. However, as noted below, the mere technical violation of FACTA does not mean that plaintiff is entitled to statutory damages. Instead, plaintiff must demonstrate that the violation was willful. Further, with respect to other receipts allegedly provided to other customers at other times during the period between December 4, 2006 and December 5, 2007, the Court is not willing to enter summary judgment as to a technical violation of FACTA's requirements, given that plaintiff has provided few receipts to the Court and that a technical violation of FACTA does not automatically mean that the plaintiff class is entitled to damages. Plaintiff's motion will be **DENIED IN PART** in this respect at this time.

B.     Willful Violation of FACTA

Plaintiff further indicates that, in order to recover statutory damages under the

_____

[5]As noted by plaintiff, however, this truncation does not satisfy the requirements of FACTA, as both the first four and last four digits of the credit card number appeared on the "truncated" receipts, exceeding the number required by FACTA.

provisions of FACTA, he must demonstrate that Defendant's violation of FACTA was "willful." See 15 U.S.C. § 1681n(a). The Supreme Court has held that "willful," as used in 15 U.S.C. § 1681n(a) encompasses a knowing or reckless violation of the law. Safeco Ins. Co. of America v. Burr, 551 U.S. 47, 56-58, 71 (2007). To establish a reckless violation, plaintiff must establish that defendant's actions entailed "an unjustifiably high risk of harm that is either known or so obvious that it should be known." Id. at 68.

Plaintiff argues that the facts of this matter demonstrate that defendant acted recklessly, if not knowingly, in violation of the statute. Plaintiff notes that defendant received a variety of invoices from HPS that referenced the credit card number truncation requirements of FACTA. Plaintiff indicates that defendant's decision to ignore these notifications demonstrates that its actions were reckless, if not intentional. Further, plaintiff notes that defendant received actual notice about its failure to comply with FACTA by JP's customers at some time prior to May 15, 2007. Even though defendant received a quote from RDS to fix the problem at an earlier time, it continued to print entire credit card numbers on receipts from May 2007 until December 5, 2007, after which time the problem was fixed.

Plaintiff indicates that at the time defendant provided him with a non-compliant receipt in August 2007, (1) defendant had entered into a contract with HPS that required it print no more than the last five digits of the credit card number; (2) defendant received at least 9 invoices containing notices from HPS regarding truncation requirements; (3) defendant received notice through customer complaints to its General Manager that it was printing the entire credit card number on receipts; (4) defendant's owner and the District Manager at Northstar had been notified of defendant's non-compliance with the truncation

19

requirements; and (5) defendant had received a quote from RDS to cure the truncation problem. Plaintiff states that these facts demonstrate that the issuance of plaintiff's receipt in August 2007 was willful, given defendant's actual knowledge. Plaintiff requests the Court grant plaintiff "partial summary judgment on his claim, and the similar claims of all Class members, that Defendant acted willfully in violation of FACTA as a matter of law."

In its response, defendants first note that the relationship between Northstar and defendant presents questions of material fact as to whether Northstar is defendant's agent or whether Northstar is an independent contractor providing services to defendant. This is relevant as plaintiff is attempting to impute the knowledge of Matt Hench, District Manager of Northstar, onto defendant. In plaintiff's suggestions in support of his motion for summary judgment, plaintiff simply presumes that Northstar is defendant's agent, without providing any analysis on this issue at all. "Whether a principal-agent relationship exists is a question of fact." Bluehaven Funding, LLC v. First American Title Ins. Co., 594 F.3d 1055, 1058 (citing Ritter v. BJC Barnes Jewish Christian Health Sys., 987 S.W.2d 377, 384 (Mo. Ct. App. 1999). "The party asserting an agency relationship has the burden of proving the existence of the relationship and the scope of the agent's authority." Id. at 1059 (citing Karr-Bick Kitchens & Bath, Inc. v. Gemini Coatings, Inc., 932 S.W. 2d 877, 879 (Mo. Ct. App. 1996).

Defendant further argues that the issue of willfulness, like most state-of-mind issues, is a question of fact for the jury. See Cowley v. Burger King Corp., 2008 U.S. Dist. LEXIS 87852, *13 (S.D. Fla., May 23, 2008); Edwards v. Toys "R" Us, 527 F.Supp.2d 1197, 1210 (C.D. Cal. 2007); Soualian v. Int'l Coffee & Tea LLC, 2008 U.S. Dist. LEXIS 91130, *4 (C.D. Cal., Feb. 9, 2008); Lenox v. Equifax Information Services LLC, 2007 U.S. Dist. LEXIS

20

34453, *16 (D. Or., May 7, 2007); <u>Cairns v. GMAC Mortgage Corp.</u>, 2007 U.S. Dist. LEXIS

16689, *8 (D. Ariz., March 7, 2007).  As noted in the <u>Cowley</u> decision:

> The motion did not cite, nor did the Court find, any FACTA published case where a court has found there to be willfulness, on summary judgment or through other means, as a matter of law.  The absence of such authority compellingly shows that whether or not Defendant knowingly and intentionally violated the statute is for the jury to decide, even in a case where, as here, there may be strong evidence from which the jury could reach that conclusion.
>
> ****
>
> A reasonable jury could certainly find that Defendant's actions were merely negligent, as opposed to reckless.  We recognize that such a finding would undermine Plaintiff's case because he is not alleging any actual damages. <u>See</u> § 1681o (only actual damages recoverable for negligent violations of the FCRA).    Nevertheless, it is up to the jury to pinpoint the negligence/recklessness line and determine whether Defendant's conduct is tantamount to a willful and reckless violation of the FCRA guidelines.

<u>Cowley</u>, 2008 U.S. Dist. LEXIS 87852, *14-17.

Defendant indicates that much of plaintiff's evidence relates to negligence (such as arguing the defendant should have read certain language in the invoices received by Northstar and paid by Northstar on behalf of defendant).  Defendant further indicates that questions exist as to (1) whether defendant's owner was aware of the FACTA requirements that customer credit cards numbers be truncated; (2) whether defendant's temporary solution (after customers complained) of providing receipts that contain only the first four and last four digits of the customers credit card number demonstrates an attempt to comply with the spirit of FACTA[6]; (3) whether anyone at Northstar should have been aware that

---

[6]Defendant argues that this demonstrates "substantial compliance" with the statute, as the first four digits of a credit card number simply identify the issuer of the credit card, which is publicly available information.  <u>See</u> Defendant's Sur-Response, Doc. No. 180. Although the Court does not believe that "substantial compliance" would be a defense to a technical violation of FACTA (such as what plaintiff has alleged

Case 4:08-cv-00339-FJG   Document 197   Filed 09/13/10   Page 21 of 22

defendant had a POS system that was non-compliant with FACTA, given that the software properly truncated credit card numbers at all other restaurants to which Northstar provided services; and (4) whether the receipt given to plaintiff that contained his entire credit card number was the result of human error, if the new procedures were in place at the time of his transaction with defendant.

The Court agrees with defendant that there are questions of material fact as to whether its conduct was willful, and that there are questions of material fact as to whether Northstar is defendant's agent. The Court further notes that there is a distinct possibility that defendant could be found to have acted willfully at some portions of time and non-willfully at other portions of time. Accordingly, plaintiff's motion for summary judgment will be **DENIED** on this issue.

## IV.    Conclusion

Therefore, for the foregoing reasons:

1.    Defendant JP's Motion for Summary Judgment (Doc. No. 100) is **GRANTED IN PART** and **DENIED IN PART**; and

2.    Plaintiff's Motion for Partial Summary Judgment (Doc. No. 98) is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS SO ORDERED.**

/s/Fernando J. Gaitan, Jr.
Chief United States District Judge

Dated:    September 13, 2010
Kansas City, Missouri

---

happened to him on August 29, 2007), the Court agrees with defendant that an attempt to comply with the spirit of the law to protect customers from identity theft is relevant as to defendant's state of mind in the willfulness inquiry.

22